UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
ERIC DUNN,	:

                            **Plaintiff,**	:     13 Civ. 6626 (ALC)(HBP)

              -against-	:

URS CORP., CAROL PANDONE, JEFF	:     <u>MEMORANDUM AND</u>
VLADKYA, and LOU TUCCIARONE,	     <u>ORDER</u>
                                     :

                          **Defendants.**	X
-------------------------------------------------------------- 
**ANDREW L. CARTER, JR., District Judge:**

      Plaintiff Eric Dunn brings this action, *pro se*, for monetary damages and costs, against defendant URS Corp. ("URS"), as well as defendants Carol Pandone ("Pandone"), Jeff Vladkya ("Vladkya"), and Lou Tucciarone ("Tucciarone") in their individual capacities. This is a discrimination suit arising out of Dunn's previous employment at URS. The Complaint alleges violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL"). Dunn, who is African-American, alleges that the defendants discriminated against him on the basis of his race when they: (1) failed to promote him, (2) paid him less than what similarly situated employees received, (3) failed to rehire him for an available position for which he was qualified while on leave, and (4) terminated his employment. This Opinion resolves the Motions to Dismiss filed by Carol Pandone and the remaining defendants.

      Dunn's NYSHRL and NYCHRL claims are dismissed for lack of subject matter jurisdiction. So are his Title VII claims against the individual defendants. The plaintiff's Title VII failure to promote claim is rejected because he never actually applied for a promotion. However, Dunn's unequal pay claim against URS under Title VII survives to the extent his paychecks fall within the 300-day statute of limitations in New York State. Moreover, his Title

1

VII claims against URS for failure to rehire and termination of employment, despite not being stated in his EEOC charge, are properly considered because they are reasonably related to the operative allegations in that complaint. For the reasons elaborated herein, Pandone's motion is GRANTED in its entirety, while the motion submitted by the remaining defendants is GRANTED in part and DENIED in part.

## BACKGROUND

Dunn was employed by URS from August 2008 to approximately six months after June 1, 2012. Compl. 31, 34. In those last six months, he was on a Standby Leave of Absence ("Standby Leave"), which culminated in his termination when he was not rehired. *See id.* 34, 67.[1] For most of the period from August 2008 to June 1, 2012, Dunn held the title of Office Engineer on URS' East Side Access ("ESA") Project. *See id.* 31. On July 1, 2010, Mark Denise, Senior Project Manager in ESA's Procurement and Logistics Department, left the Project. *Id.* 6. He had been Dunn's direct supervisor. *Id.* Six months prior to Denise's departure, Dunn's workload had increased twofold due to: the departure of another employee, Leslie Bailey; the movement of a million dollars' worth of material and equipment to a larger facility; and a "Stimulus purchase" of material valued at 19 million dollars. *Id.* As a result, Dunn's responsibilities and workload exceeded the job description of an Office Engineer. *Id.* His portfolio and level of authority caused him to serve in the capacity of a manager, in spite of his title being unchanged. *Id.* Indeed, Dunn was listed as a Materials Manager in the Project's organizational chart. *Id.* 32. Employees at the new facility regularly contacted Dunn for

---

[1] Page numbers above 34 are derived from adding the first part of the Complaint submitted via ECF, which is 34 pages, to the second part of the Complaint submitted via ECF, which is 37 pages. Thus, a citation to page 67 is also a citation to page 33 of the second part of the Complaint. For convenience, citation to the exhibit designations, which are neither consecutive, complete, nor in alphabetical order, has been eschewed in favor of page numbers.

2

managerial instruction despite the fact that he was not their direct manager, and for 10 months, until the hiring of Pandone to replace Denise, Dunn singlehandedly oversaw the Procurement and Logistics Department. *Id.* 6-7.

On August 16, 2011, Dunn emailed Vladkya, Program Executive on the ESA Project, to request a meeting. *Id.* 6. Although Dunn's email did not indicate the purpose of the meeting, Vladkya's reply stated: "Just a heads up MTA will not approve $$$ increases." *Id.* 15. In their August 22, 2011 meeting, Dunn expressed his opinion that he deserved a salary increase based on the significant expansion of his workload and responsibilities since Denise had left the Project. *Id.* 7. Vladkya repeated that the MTA was not approving salary increases at the time, and added that he would monitor the situation for any changes to the MTA's policy in the remainder of the year. *Id.* A month-and-a-half later, Dunn discovered that numerous URS employees and subcontractors had either received pay raises or were in the process of obtaining pay raises and promotions, and that none of them were African-American. *Id.* Moreover, Vladkya had submitted many letters on behalf of these individuals to the MTA Chief Finance Officer assigned to the Project, in support of the salary increases and promotions. *Id.* Dunn provides a non-exhaustive list of 12 applicants for pay raises, along with the respective dates on which Vladkya submitted his letters of endorsement. *Id.*

On March 24, 2012, Dunn met with Pandone and asked her to meet with Vladkya or Pete Malvese on his behalf regarding a salary increase on the basis that, in addition to his normal workload, he had been appointed the sole individual responsible for creating thousands of material requisitions on the Amtrak side of the ESA Project. *Id.* 7-8. Pandone agreed to make the request on behalf of Dunn to Malvese when she determined that he was in a good mood. *Id.* 8. In her March 24, 2012 meeting with Dunn, Pandone made no mention of a concern about

Dunn's job performance. *Id.* However, in a March 30, 2012 meeting, Vladkya and Tucciarone stated that Pandone had concerns regarding his job performance. *Id.* By that point, Dunn had worked with Pandone for over a year without any such indication from Pandone. Dunn's evaluations for the immediately preceding years of 2010 and 2011 had been good, if not excellent, *id.* 6, 33, and it was only a few days following Dunn's request that Pandone assist him in obtaining a salary increase that he was first made aware of her reservations, *id.*

In a subsequent meeting that included Pandone, Vladkya, and Tucciarone, Dunn discovered that Pandone's concerns were about minor mistakes he had made, including errors Pandone herself was prone to commit. *Id.* 9. During their meeting, Pandone agreed to give Dunn an overview of the materials management computer system, as well as procurement and logistics procedures, in order to address his performance deficiencies. *Id.* However, Pandone never followed through on her commitment in that meeting, and moreover withheld information during Dunn's ensuing evaluation period that would have helped him complete a task she had assigned him. *Id.* On another occasion, Pandone wrongfully accused Dunn of intercepting a fax and stated, "I know what you did Eric and I'm going to have the last laugh." *Id.* 9-10.

During a June 1, 2012 performance evaluation meeting attended by Malvese, Vladkya, Pandone, and Tucciarone, Dunn was told that Pandone had not seen any improvement in his work performance. *Id.* 11. Dunn left the Project that day. *Id.* Approximately one week later, the Human Resources Department of URS called Dunn and provided him with two options: self-termination, which would have allowed him to collect a severance package, or Standby Leave, which would have allowed him to remain in the URS system without pay. *Id.* 33-34. On Standby Leave, he would be eligible for certain health benefits that he would have to pay for out-

4

of-pocket. *Id.* Moreover, Dunn would be eligible for rehire in the event his skills were sought in an available position. *Id.* 34. In such a case, URS would contact him. *Id.*

At some point while on Standby Leave, Dunn visited the URS website and saw an available Office Engineer position in the New York City metropolitan area, but he was never contacted. *Id.* Furthermore, Dunn's old position was listed on the URS website as Railroad Force Account Warehouse & Operations Manager. *Id.* Standby Leave lasts a maximum period of six months prior to an employee's automatic termination in the event the employee is not rehired. *Id.* 67. Dunn was never rehired. *Id.* 34.

## STANDARD OF REVIEW

To withstand a motion to dismiss, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint "need not include detailed factual allegations, but must contain sufficient factual matter ... to state a claim to relief that is plausible on its face." *Corona Realty Holding, LLC v. Town of N. Hempstead*, 382 F. App'x 70, 71 (2d Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (internal quotations omitted). Incantation of the elements of a cause of action, "supported by mere conclusory statements," is not enough to show plausibility. *Id.* at 72. Nevertheless, "[a] document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citation omitted) (internal quotations omitted). In particular, "the pleadings of a *pro se* plaintiff ... should be interpreted to raise the strongest arguments that they suggest." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (internal quotations omitted).

## DISCUSSION

I.  *The NYSHRL and NYCHRL Claims*

Dunn's NYSHRL and NYCHRL claims are dismissed as against all of the defendants due to lack of subject matter jurisdiction. On November 16, 2012, Dunn filed a complaint with the New York State Division of Human Rights ("NYSDHR"). Compl. 20. In that complaint, he alleged that he experienced racial discrimination when the defendants: (1) "[d]enied [him] a promotion or pay raise" and (2) "[p]aid [him] a lower salary than other workers in [his] same title." *Id.* 23. The NYSHRL and the NYCHRL each provide that a plaintiff who files a charge with a local human rights commission such as the NYSDHR is precluded from later filing the same suit in federal or state court. *York v. Ass'n of Bar of City of N.Y.*, 286 F.3d 122, 127 (2d Cir. 2002). It does not matter that Dunn's complaint with the NYSDHR only alleged violations of the NYSHRL. *See* Compl. 26. His NYCHRL claims are barred as well because the election-of-remedies doctrine prohibits "consideration of any claim … arising out of the same incident on which plaintiff's SDHR complaint was based." *Williams v. City of N.Y.*, 916 F. Supp. 2d 517, 521 (S.D.N.Y. 2013) (brackets omitted). The operative factual allegations in this action are the same as they were in Dunn's NYSDHR submission. *See* Compl. 31-34.

Likewise, it is of no consequence that Dunn did not sue for failure to rehire and wrongful termination before the NYSDHR. *See* Compl. 23. Those claims cannot be heard now because "the election-of-remedies bar is not limited to the precise claims brought in the administrative proceeding, but extends to all claims arising out of the same events." *Coppedge v. N.Y.C. Sales Inc.*, No. 10 Civ. 6349, 2011 WL 4343268, at *2 (S.D.N.Y. Sept. 8, 2011) (brackets omitted). *See also Rosario v. N.Y.C. Dep't of Educ.*, No. 10 Civ. 6160, 2011 WL 1465763, at *2 (S.D.N.Y. April 15, 2011) ("Since the underlying facts of the claim Rosario brought before the NYSDHR

are almost identical to those alleged in this case, the plaintiff's state law claims are barred pursuant to NYSHRL § 2[97](9) and NYCHRL § 8-502(a).").

Nor may the Court entertain a plaintiff's attack on the findings of the NYSDHR. "Instead, the dissatisfied litigant must appeal the decision of the State Division to the state Supreme Court." *Stanley v. Guardian Sec. Servs., Inc.*, 800 F. Supp. 2d 550, 556 (S.D.N.Y. 2011).

## II. *The Title VII Claims*

Dunn sues URS, Pandone, Vladkya, and Tucciarone under Title VII[2] for declining to promote him, paying him less than what similarly situated employees received, failing to rehire him for an available position for which he was qualified while on Standby Leave, and terminating his employment, all because he is African-American.

To succeed in a claim of disparate treatment, a plaintiff ultimately must "establish a *prima facie* case by demonstrating that: (1) she is a member of a protected class; (2) her job performance was satisfactory; (3) she suffered adverse employment action; and (4) the action occurred under conditions giving rise to an inference of discrimination." *Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir. 2006) (citing *McDonnell Douglas*, 411 U.S. 792, 802 (1973)). However, this is an evidentiary standard. *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 510 (2002). At the pleading stage, Dunn need only allege facts sufficient "to state a claim for relief that is plausible on its face." *Corona Realty Holding, LLC*, 382 F. App'x at 71.

---

[2] Title VII provides, in relevant part: "It shall be an unlawful employment practice for an employer (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.A. § 2000e-2(a) (West).

Dunn alleges that he is a member of a protected class, *see M.O.C.H.A. Soc'y, Inc. v. City of Buffalo*, 689 F.3d 263, 273-274 (2d Cir. 2012) (African-Americans a protected class), and that his job performance was good, if not exceptional. Moreover, he refers to discriminatory actions that, if supported in the pleadings, qualify as adverse employment decisions under the statute. *Mills v. S. Conn. State Univ.*, 519 F. App'x 73, 75 (2d Cir. 2013) (failure to promote); *Borrero v. Am. Exp. Bank Ltd.*, 533 F. Supp. 2d 429, 438 (S.D.N.Y. 2008) (unequal pay); *Windsor v. Rockefeller Ctr/Tishman Speyer*, No. 01 Civ. 4374, 2002 WL 1467834, at *3 (S.D.N.Y. July 8, 2002) (failure to rehire); *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003) (termination of employment). *See also Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) ("A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment.... An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities.") (internal quotations omitted).

Furthermore, construed liberally as required, this *pro se* plaintiff has pled sufficient facts to give rise to an inference of race-based discrimination. Dunn states that during a meeting with Vladkya on August 22, 2011, in which Dunn requested a salary increase, Vladkya told him that the MTA was not approving salary increases and that he would look out for any changes to that policy in the remainder of the year. Indeed, Dunn attaches an email from Vladkya dated August 17, 2011 in which Vladkya provides the plaintiff notice prior to their August 22 meeting of the MTA policy against salary increases. Dunn notes that approximately one-and-a-half months after the meeting, he discovered that many URS employees and subcontractors had either received salary increases or were in the process of securing such increases, and that none of those employees were of African-American descent. In fact, the Complaint states that Vladkya

himself had submitted letters to the MTA's Chief Finance Officer assigned to the ESA Project in support of the pay raises. Dunn proceeds to list, non-exhaustively, the dates of the letters and the names of the 12 applicants to whom the letters correspond. The plaintiff has met his initial burden.

Dunn's NYSDHR complaint was cross-filed with the Equal Employment Opportunity Commission ("EEOC") on November 16, 2012. *See* Compl. 3. "For a Title VII claim arising in New York to be timely, a plaintiff must file the charge with the Equal Employment Opportunity Commission ... within 300 days of the allegedly unlawful employment practice." *Baroor v. N.Y.C. Dep't of Educ.*, 362 F. App'x 157, 159 (2d Cir. 2010). The 300-day statute of limitations means that the only adverse actions properly under consideration by this Court are those occurring between January 21, 2012 and the date of the EEOC submission.

### A.     The Individual Defendants

The Title VII claims against the individual defendants are dismissed. *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1314 (2d Cir. 1995) ("the statutory scheme and remedial provisions of Title VII indicate that Congress intended to limit liability to employer-entities").

### B.     Failure to Promote

Dunn's failure to promote theory does not pass muster because he does not allege that he applied for a higher position. "To establish a *prima facie* case of hiring discrimination under Title VII, plaintiff must demonstrate that (i) she is a member of a protected class; (ii) she applied and was qualified for a job for which the employer was seeking applicants; (iii) despite her qualifications, she was rejected; and (iv) after her rejection, the position remained open and her employer continued to seek applicants from persons of plaintiff's qualifications." *Murray v. Bd. of Educ. of City of N.Y.*, 984 F. Supp. 169, 178 (S.D.N.Y. 1997) (citing *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 308 (1996)). *See also Brown v. Coach Stores, Inc.*, 163 F.3d

706, 710 (2d Cir. 1998) ("We read *McDonnell Douglas* and *Burdine* generally to require a plaintiff to allege that she or he applied for a specific position or positions and was rejected therefrom, rather than merely asserting that on several occasions she or he generally requested promotion."). To the contrary, Dunn states that he pursued, and was unsuccessful in obtaining, a salary increase. A promotion and a pay raise are not the same, as demonstrated by the fact that if Dunn had been awarded a salary increase, his title would not have changed.

**C.     Unequal Pay**

Dunn avers that, beginning approximately six months prior to July 1, 2010, his workload doubled such that he had responsibilities exceeding what his title of Office Engineer dictated. He notes by way of example that for a period of 10 months, he oversaw the entire Procurement and Logistics Department for the ESA Project, and that his workload, authority, and even an organizational chart, placed him squarely in a managerial role. Even after Pandone was hired in May 2011 to replace the Senior Project Manager of the Procurement and Logistics Department, who had departed in July 2010, Dunn alleges that in addition to his duties as Office Engineer, he was appointed as the only person tasked with creating thousands of material requisitions for the Amtrak side of the ESA Project. Nevertheless, during this entire period, ending in his transition to Standby Leave shortly after June 1, 2012, Dunn was paid the salary of an Office Engineer.

Clearly, Dunn has satisfied the elements of wage discrimination at the pleading stage. The requirements are straightforward:

> [T]o establish a *prima facie* case of unequal pay under Title VII, a plaintiff must show that: i) he is a member of a protected class; and ii) he was paid less than non-members of his class for work requiring substantially the same responsibility. A Title VII plaintiff must also produce some evidence of discriminatory animus in order to establish a *prima facie* case of intentional salary discrimination.

*Simpri v. N.Y.C. Agency for Children's Servs.*, No. 00 Civ. 6712, 2003 WL 169803, at *2 (S.D.N.Y. Jan. 23, 2003) (citation omitted). Because the continuing violation doctrine does not

apply to claims of discriminatory pay, only Dunn's paychecks falling within the period from January 21, 2012 to the time he took Standby Leave will be considered. *See Pollis v. New Sch. for Soc. Research*, 132 F.3d 115, 119 (2d Cir. 1997) ("a claim of discriminatory pay is fundamentally unlike other claims of ongoing discriminatory treatment because it involves a series of discrete, individual wrongs rather than a single and indivisible course of wrongful action").

**D.     Failure to Rehire and Termination of Employment**

It is true that Dunn's EEOC charge did not state claims of failure to rehire and termination of employment. However, they are not barred for Dunn's failure to exhaust his administrative remedies. The claims are reasonably related to the operative facts in the EEOC filing such that they provide the defendants adequate notice. *See Gomes v. Avco Corp.*, 964 F.2d 1330, 1334 (2d Cir. 1992) ("In determining whether a particular claim is reasonably related to the plaintiff's EEOC complaint, we look not merely to the four corners of the often inarticulately framed charge, but take into account the scope of the EEOC investigation which can reasonably be expected to grow out of the charge ....") (internal quotations omitted) (brackets omitted).

It is evident that the EEOC investigation would have expanded to cover the alleged discriminatory refusal to rehire and termination of employment. The factual allegations regarding the refusal to rehire were included in the EEOC charge. Moreover, shortly after June 1, 2012, Dunn had a maximum of six months of Standby Leave during which he could be rehired before his termination became effective. The EEOC charge, filed on November 16, 2012, was almost six months later. If Dunn was not terminated by the time of the EEOC filing, he would have been a few weeks after the investigation commenced, assuming that it began on or around the date of the filing. *See also EEOC v. Nat'l Cleaning Contractors, Inc.*, No. 90 Civ. 6398, 1991 WL 161364, at *2 (S.D.N.Y. Aug. 16, 1991) ("Alston can not be barred from asserting this

11

claim …. Her proposed Title VII claim is reasonably related to the sexual harassment charge that is the predicate for the EEOC litigation…. Her proposed Title VII claim merely adds that as a result of refusing those [sexual] advances, she was fired.").

## CONCLUSION

For the aforementioned reasons, Pandone's Motion to Dismiss is GRANTED in its entirety and the remaining defendants' Motion to Dismiss is GRANTED in part and DENIED in part. Specifically, Dunn's Title VII claims against URS for unequal pay, failure to rehire, and termination of employment survive. All other claims are DISMISSED. The Clerk of Court is respectfully directed to terminate defendants Pandone, Vladkya, and Tucciarone, as well as ECF Nos. 25 and 27.

**SO ORDERED.**

Dated:    New York, New York
               January 12, 2015

_____
**ANDREW L. CARTER, JR.**
United States District Judge

12