USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: 9/30/16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x
ERIC DUNN,

                                Plaintiff,

        -against-                      13-CV-6626 (ALC)

URS CORP., et al.,                    **OPINION & ORDER**

                              Defendants.

---------------------------------------------------------------- x

ANDREW L. CARTER, JR., District Judge:

In this action, Eric Dunn ("Plaintiff") is suing his former employer, the URS Corporation ("URS" or "Defendant") for race discrimination in violation of Title VII of the Civil Rights Act of 1964. Dunn claims that URS failed to give him a raise, terminated him, and failed to rehire him because of his race. URS has moved for summary judgment on this Title VII claim. For the following reasons, URS's motion is granted.

## BACKGROUND[1]

Eric Dunn began working for the URS Corporation in August 2008. (Def. R. 56.1 ¶ 42.) At the time, URS had contracted with the Metropolitan Transit Authority ("MTA") to provide services for the East Side Access ("ESA") project designed to expand the Long Island Railroad into a new station to be built and incorporated into Grand Central Station. (*Id.* ¶¶ 26, 29.) URS

---

[1] Defendant has requested that the Court grant its motion in its entirety because of Plaintiff's disregard for Court procedure—namely, Plaintiff's failure to file a Statement of Material Facts pursuant to Local Civil Rule 56.1. However, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules . . . [and] may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001). In any case, the material facts are clear. Plaintiff's failure to file a Rule 56.1 statement will be overlooked and the Court will not grant the motion on these grounds. Instead, the Court draws primarily from Defendant's Local Rule 56.1 Statement of Material Facts and the documents cited therein. Where appropriate, the Court also relies on other elements of the extensive factual record—including the sworn statements and documents that Plaintiff has submitted in support of the February 12, 2016 Declaration of Chevone T. Toscano.

1

hired Dunn to work on the ESA project as a Contract Administrator. (*Id.* ¶ 42.) In this position, Dunn reported to Jeffrey Vladkya, a URS Program Executive. (*Id.* ¶ 45.) However, Vladyka did not supervise Dunn on a day-to-day basis, (*id.* ¶ 42), as Dunn's role required him to support Sayed Shariff, Chris Sklavanorkis, and Shanele Woodall, (*id.* ¶ 46.)

In January 2009, Shariff, Sklavanorkis, and Woodall complained to Vladkya about Dunn's performance as Contract Administrator. (*Id.* ¶ 47, Vladyka. Decl. Ex. 1.) According to Vladkya's notes taken at that time, they complained that Plaintiff: was a careless Contract Administrator, was poor in following directions, was informal in his responses, had an insufficient level of professionalism, lacked a positive attitude, made mistakes on spreadsheets, made other errors, and was not a strong writer. (Def. R. 56.1 ¶ 49.) Vladyka and Dunn discussed these complaints and Dunn was notified that Shariff would oversee a four to six week training period concluding with a reevaluation of Dunn's performance. (*Id.* ¶¶ 50-51.) Following this period, Shariff, Sklavanorkis, and Woodall did not see sufficient improvement and the MTA notified URS that they wanted Dunn removed from his position as Contract Administrator. (*Id.* ¶ 52.)

Vladyka had a discussion with the MTA representatives about other available positions and Dunn's potential suitability for them. (*Id.* ¶ 54.) On February 4, 2009, Vladyka met with Dunn to suggest having Dunn transfer to another position. (*Id.* ¶ 55.) Since Dunn expressed interest, Vladyka arranged an interview for Dunn, and the MTA ultimately approved Dunn's new role as an Office Engineer for the Force Account group on the ESA project. (*Id.* ¶¶ 56-57.) Plaintiff initially reported to Peter Malvese, a URS employee within the Force Account Group. (*Id.* ¶ 59.) Dunn did not perform particularly well in the Force Account Group and another employee took on many of Dunn's responsibilities. 60. Around July 2009, Dunn was

transferred to the Force Account Materials group on the ESA project. (*Id.* ¶ 61.) The Force Account Materials Group was comprised of three members: Dunn, Mark Denise and Leslie Bailey. (*Id.* ¶ 62.)

Around July 2010, Denise, the Force Account Materials group's Senior Project Manager and Dunn's direct supervisor, left the ESA project. (*Id.* ¶¶ 68, 76.) URS did not hire a replacement for Denise until May 2011. (*Id.* ¶ 85.) According to Dunn, he was responsible for handling all or most of the managerial duties and responsibilities of the Procurement & Logistics Department between July 1, 2010 and mid-May 2011. (Dunn Aff. ¶ 7.[2]) Moreover, he saved the department $114,809.83 in or around this period. (Dunn Stmt. at 1.[3]) According to URS, Dunn did not perform Denise's job during this interim period. (Def. R. 56.1 ¶ 78.) Instead, Denise's responsibilities were spread out and temporarily handled by numerous other workers on the ESA project. (*Id.* ¶ 77.) Technical issues were handled by Construction Managers working with Engineers. (*Id.* ¶ 79.) Carol Pandone, then an employee of the Long Island Rail Road, took on certain technical and management responsibilities in the Force Account Materials Group. (*Id.* ¶ 80.) Malvese handled additional management and budgetary responsibilities for the Force Account Materials group. (*Id.* ¶ 82.)

**Dunn's Requests for a Raise**

Following Denise's departure, Dunn asked for a raise several times. (Dunn Dep. Tr. at 41:22-42:2; 42:23-43:4.) He approached both Vladyka and Malvese about the topic. (*Id.* at 42:6-12; Dunn Stmt. at 2.) In August 2011, Dunn sent Vladyka an email, requesting a meeting.

---

[2] This affidavit is dated June 8, 2014 and is attached to the Toscano Declaration as Exhibit K.
[3] Plaintiff relies upon the Statement of Claim that he submitted when filing the Complaint *pro se*. This *pro se* submission was submitted under the penalty of perjury, and is thus treated as a verified complaint that is admissible for this motion. *See Robinson v. Gov't of Malaysia*, 269 F.3d 133, 145 (2d Cir. 2001) ("Robinson's complaint, because it was verified, also constituted evidence before the court.").

3

(Def. R. 56.1 ¶ 198.) Vladyka anticipated that the meeting would be related to Dunn's desire for a pay raise. (*Id.* ¶ 199.) Vladyka responded by email on August 17, 2011, stating, "Just a heads up MTA will not approve $$$ increases." (*Id.* ¶ 200; Dunn Dep. Tr. at 43:4-8.) At a meeting on August 22, Vladyka mentioned again that the MTA "isn't approving salary increases" and noted that that things might change at the end of the year. (Dunn Stmt. at 2.) Weeks later, Dunn learned that other employees were receiving raises and that Vladyka had submitted letters in support of their promotions and raises. (Dunn Dep. Tr. at 43:9-11; 54:11-15.) Moreover, Dunn searched for these employees on the "ESA internet" and discovered that none of the employees he researched was of African-American descent. (*Id.* at 43:11-15.)

According to Vladyka, he, and URS in general, did not have the capacity to hire, promote, transfer, or increase the salary of any person working on the MTA's ESA project without the MTA's approval. (Def. R. 56.1 ¶ 186.) In actuality, the following process would take place for URS employees who received a transfer, promotion, or salary increase: a MTA employee would notify Vladyka about the update to the URS employee's employment, Vladyka would then send a letter to the MTA requesting written approval, then the MTA would grant this approval despite the fact that the change in position and/or salary had already been determined by the MTA. (*Id.* ¶ 188.) Despite this, Vladyka asserts that he asked the MTA to increase Dunn's salary prior to responding to Dunn's email.[4] (*Id.* ¶ 195.) The MTA denied this request on the basis of Dunn's job performance. (*Id.* ¶ 196.) Specifically, the MTA notified Vladyka that they would not approve a salary increase without a promotion and that they would not promote Dunn because of his job performance. (*Id.* ¶ 197.)

---

[4] And possibly prior to receiving Dunn's email from August 2011. Vladyka's statement in the declaration is unclear as to the sequence of these events.

4

Additionally, Vladyka notes that the MTA has given numerous promotions, transfers, and salary increases to African American employees working on the ESA project. (*Id.* ¶ 207.) Vladyka has written numerous letters to the MTA requesting formal, written approval by the MTA for changes in position and/or salary of African American employees working on the ESA project. (*Id.* ¶ 208.) And, while Dunn has produced the names of twelve, non-black employees that received a raise in October 2011, (Toscano Decl. Ex. E), Vladyka has noted that he sent confirmatory letters for two African American employees who received raises in October 2011 (Vladyka Supp. Decl. ¶¶ 3-4).

In May 2011, Carol Pandone replaced Marc Denise as Senior Project Manager in the Force Account Materials Group. (Def. R. 56.1 ¶ 91.) With this position, she began to supervise Dunn on the day-to-day level. (*Id.*) Though, she was not responsible for supervising Dunn nor did she review Dunn's work product during the interim period when she increased her management responsibilities in Denise's absence. (*Id.* ¶ 81.) In January 2012, Dunn received a year-end evaluation for 2011. (Toscano Decl. Ex. B.) This evaluation was undeniably positive. (*Id.*) It noted that Dunn significantly exceeded expectations in various measures of his performance. (*Id.*) Under "Manager's Comments" it noted: "Eric has done a very good job working as part of the procurement and logistics group. He has created sound relationships with the railroad partners and provides value to our team and the ESA project." (*Id.*) The manager is not identified on the evaluation, but the evaluation was signed by Vladyka on January 12, 2012. (Vladyka Supp. Decl. ¶ 5.)

On March 24, 2012, Dunn privately asked Pandone to approach Malvese or Vladyka and request a salary increase for him on his behalf. (Dunn Stmt. at 2-3.) Dunn felt that he was still doing a substantial amount of work in addition to his regular responsibilities. (*Id.* at 3.)

According to Dunn, Pandone agreed to approach Malvese and said she would pick a time when she thought he would be in a good mood. (*Id.*) Dunn also states that, at that point, Pandone had not yet mentioned anything about his work performance or had indicated that she any issues with it. (*Id.*)

**Dunn's Termination**

Conversely, Pandone broadly notes that she noticed Dunn's job performance was deficient soon after she took over as Senior Project Manager and after she had day-to-day supervision over Dunn. (Pandone Decl. ¶ 29.) She attempted to work with Dunn and gave him an opportunity to improve his job performance to a satisfactory level. (*Id.* ¶ 30.) On January 20, 2012, Pandone complained to Vladyka about Dunn's performance, highlighting his carelessness and various errors. (*Id.* ¶ 31.) In March 2012, Pandone complained to Louis Tucciarone, Vladyka's successor as URS Program Executive. (Def. R. 56.1 ¶¶ 31, 93.) On March 30, 2012, Vladyka and Tucciarone met with Dunn to discuss Pandone's complaints and the need for improvement in his performance. (*Id.* ¶ 100.) Specifically, they noted that Pandone reported having to spend too much time reviewing the details of Dunn's work in order to catch and correct errors or avoid problems. (*Id.* ¶ 105.) The examples she cited reflected an inattention to details and lack of familiarity with important purchasing policies and procedures. (*Id.* ¶ 107.) Overall, the comments suggested a need to be more proactive, knowledgeable, professional, and attentive. (*Id.* ¶¶ 107-10.) Tucciarone encouraged Dunn to improve his performance and stated that he intended to follow up in approximately thirty days. (*Id.* ¶ 113.)

Pandone and Dunn met twice more in early April. In the first meeting, Pandone discussed specific concerns she had with Dunn's performance. (*Id.* ¶ 118.) She also reviewed with Dunn information, procedures, and other matters she believed he should have already

known. (*Id.* ¶ 119.) Malvese attended the second meeting and, here, Pandone further explained to Dunn her concerns about the unacceptably low level of Dunn's job performance and provided several examples where Dunn failed to deliver on tasks, did not timely achieve other tasks, and times where she was required to complete tasks Dunn could not complete. (*Id.* ¶¶ 125, 127.) Dunn states that Pandone showed him minor mistakes, many of which she was prone to make herself. (Dunn Stmt. at 4.)

At these points, Dunn acknowledged Pandone's complaints but also requested some training to refresh his knowledge of certain software. (Def. R. 56.1 ¶ 129; Dunn Dep. Tr. at 135:10-11; Dunn Stmt. at 4.) Pandone reluctantly agreed to provide this training because she believed that Dunn had been provided this training in or about January 2011. (Def. R. 56.1 ¶ 131-32.) Dunn maintains that he had never received this training prior to the April 2012 meeting. (Dunn Dep. Tr. at 130:7-10.) Dunn also asked that Pandone and Malvese monitor his performance for the following month and noted that he would leave if they were not satisfied. (Def. R. 56.1 ¶ 130.) In his testimony, Dunn confirms that he made those remarks, but clarifies that it was contingent on Pandone providing a refresher course for him. (Dunn Dep. Tr. at 134:22-136:7.)

According to Dunn, Pandone never provided him with the assistance that she promised and withheld work-related information that would have assisted him in completing tasks. (Dunn Stmt. at 4; Dunn Dep. Tr. at 44:2-45:5, 47:6-14.) URS and Pandone do not dispute these facts. Instead, they contend that, on April 9, 2012, Dunn never disputed having been provided the same training as other employees. (Def. R. 56.1 ¶ 133.)

About ninety days after the April 9, 2012 meeting, Pandone reported to Tucciarone and Malvese that Dunn had failed to improve his performance sufficiently. (*Id.* ¶ 138.) She showed

7

them various emails and notes that she had compiled of more recent work problems and errors made by Dunn. (*Id.* ¶ 140.) She then informed Tucciarone and Malvese that the MTA, her employer and their client, wanted Dunn removed from his position in the Force Account Materials group on the ESA project. (*Id.* ¶ 141.) On June 1, 2012, Pandone, Tucciarone, and Malvese met with Dunn and notified him that Pandone failed to see improvement. (*Id.* ¶ 144.) Dunn was then formally removed from his position. (*Id.* ¶ 148.)

**Dunn Is Not Re-Hired by URS**

At the time of his removal, there was no other position related to the ESA project to which Dunn could be transferred. (*Id.* ¶ 151.) Dunn was presented the opportunity to be placed on Standby Leave instead of being terminated immediately. (*Id.* ¶ 152.) Under Standby Leave, a URS employee remains technically employed and receives certain and medical benefits with the hope that he or she may find another position at URS within a six-month period and remain employed. (*Id.*) According to URS, this policy does not require URS to review its open positions, determine whether there is a potential match for any person on Standby Leave, or notify persons on Standby Leave of openings for which that person could potentially be qualified. (*Id.* ¶ 158.) Instead, their policy is that persons on Standby Leave are required to be proactive in looking for openings for which they are interested and notifying URS of their interest in any such position. (*Id.* ¶ 160.) Dunn was finally terminated when the Standby Leave lapsed after six months.

During Standby Leave, Dunn had access to URS's list of job openings posted on the Internet. (*Id.* ¶ 164.) It is undisputed that he not did apply for any of these jobs, (*id.* ¶ 165), and that URS did not contact Dunn in regard to any these positions, (Dunn Dep. Tr. at 62:23-63:5). Nonetheless, Dunn states that URS guidelines and Tucciarone's representations at the final

meeting led him to believe that URS would reach out to him about eligible positions during Standby Leave. (Dunn Dep. Tr. at 62:19-63:5, 142:5-22; Toscano Decl. Ex. H.) The Standby Leave guidelines are ambiguous as to who must reach out to whom during Standby Leave—it simply requires that the URS office manager and human resources representative "obtain and provide contact information to maintain communications [with the employee] during the expected duration of standby leave." (Tare Decl. Ex. 1 at 3.) Furthermore, Tucciarone's notes from the June 1, 2012 meeting state:

> I explained to [Dunn] that . . . [URS] would look for other job opportunities he might qualify for. I told him I would arrange a time for him to meet with the NY office personnel early the following week and that they would discuss with him his options for future employment with URS. I gave him my cell number (he gave me his) and I told him we would be in touch about that follow up meeting [in the Manhattan offices].

Toscano Decl. Ex. H. According to URS, it was not Tucciarone's practice to review open URS positions and notify persons on Standby Leave. (Def. R. 56.1 ¶ 161.) It is not disputed that URS emailed Dunn on June 5, 2012 with the information and documentation concerning the leave policy. (¶ 153.) Dunn confirmed his participation in the program via email on June 7, 2012. (*Id.* ¶ 154.)

In his testimony regarding the length of his time working with URS, Dunn has acknowledged that neither Vladyka, Malvese, Tucciarone, nor any other URS employee has ever made a racial remark to him. (Dunn Dep. Tr. at 48:14-49:4.) He acknowledged that he never witnessed Pandone making a racial remark to him or to anyone else and that he is unaware of Pandone ever making a racial remark. (*Id.* at 53:2-11.) He did note that a third party once told him about a URS employee making a racial remark. (*Id.* at 50:8-10.) But, he did not remember who told him, when this person told him, the identity of the speaker, the content of the remark, or the department where it took place. (*Id.* at 50:11-51:16.)

9

Dunn filed a verified complaint with the New York State Division of Human Rights on November 16, 2012, while he was on Standby Leave. (Def. R. 56.1 ¶ 12.) The NYSDHR investigated Dunn's claims and concluded that there was no probable cause to believe that any URS defendant engaged in the discriminatory acts alleged. (*Id.* ¶ 15.) The NYSDHR Complaint was cross-filed with the United States Equal Employment Opportunity Commission. (*Id.* ¶ 16.) They adopted the findings of the NYSDHR and issued a right-to-sue letter dated June 20, 2013. (*Id.* ¶ 17.) Dunn filed a complaint in this Court on September 17, 2013. (ECF No. 2.)

## DISCUSSION

### I. Standard of Review

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). There is no issue of material fact where the facts are irrelevant to the disposition of the matter. Speculation, conclusory allegations and mere denials are not enough to raise genuine issues of fact. *National Union Fire Ins. Co. of Pittsburgh Pa. v. Walton Ins. Ltd.*, 696 F. Supp. 897, 900 (S.D.N.Y. 1988). To avoid summary judgment, a party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Summary judgment may be proper even in workplace discrimination cases, which tend to be very fact-intensive, because "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to other areas of litigation." *Caban v. City of New York,* No. 11 Civ. 3417(SAS), 2012 WL 5992088, at *2 (S.D.N.Y. Nov. 30, 2012) (quoting *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir. 1985)).

Courts must distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture as even in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment. *Caban,* 2012 WL 5992088, at *2 (quoting *Bickerstaff v. Vassar Coll.,* 196 F.3d 435, 448 (2d Cir. 1999); *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir. 1997)).

## II.     Burden of Proof

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* prohibits employment discrimination on the basis of race, color, religion, sex, or national origin in making employment-related decisions. 42 U.S.C. § 2000e–2(a)(1). On a motion for summary judgment on Title VII and ADEA claims, the Supreme Court has set forth a three-part burden shifting scheme in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-03 (1973). Under *McDonnell Douglas,* the plaintiff bears an initial burden of "proving by a preponderance of the evidence a *prima facie* case of discrimination." *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252-53 (1981). If a plaintiff establishes a *prima facie* case of discrimination or retaliation, a presumption of discrimination or retaliation rises and the burden shifts to the defendant to offer a legitimate non-discriminatory or non-retaliatory reason for the adverse action. *Sharpe v. MCICommc'ns Servs., Inc.,* 684 F. Supp. 2d 394, 401 (S.D.N.Y. 2010) (citing *Stratton v. Dep't for the Aging,* 132 F.3d 869, 879 (2d Cir. 1997)). If the defendant is able to offer a legitimate basis for the decision, without the presumption of discrimination, the plaintiff must then establish, that the proffered nondiscriminatory reason was pretextual and that the defendant's act was at least partially motivated by discrimination. *Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 93-94 (2d Cir. 2001); *Back v. Hastings On Hudson Union Free School Dist.,* 365 F.3d

11

107, 123 (2d Cir. 2004) ("To defeat summary judgment within the *McDonnell Douglas* framework . . . the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors.") (citation omitted).

### A. Prima Facie Case for Discrimination

To establish a prima facie case of discrimination under Title VII, Plaintiff must make a showing that: (1) he is a member of a protected class; (2) he was qualified for the position at issue; (3) he suffered an adverse employment action; and (4) the circumstances of the adverse employment action give rise to an inference of discrimination. *See Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004); *see also Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000) (describing that in the context of alleged discriminatory discharge, the second prong requires plaintiff to show that he was "performing his duties satisfactorily").

### B. Prima Facie Case for Failure to Re-Hire

To establish a *prima facie* case of discrimination in hiring, plaintiff must make a showing that: (1) that she is a member of a protected class; (2) that she applied and was qualified for a position that the defendant sought to fill; (3) that she was rejected; and (4) that the rejection occurred under circumstances giving rise to an inference of invidious discrimination. *Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir. 2010).

### C. Prima Facie Case for Unequal Pay Based on Race

To establish a *prima facie* case of pay discrimination, a plaintiff must show that: (1) she was a member of a protected class; (2) she was qualified for the job in question; (3) she was paid less than members outside of the protected class for the same work; and (4) the employer's decision to pay the plaintiff less occurred under circumstances that give rise to an inference of

12

discrimination. *Lawless v. TWC Media Sols., Inc.*, 498 F. App'x. 613, 617-18 (2d Cir. 2012) (citing *Belfi v. Prendergast,* 191 F.3d 129, 139-40 (2d Cir. 1999)).

### III.     Dunn Does Not Set Forth a Prima Facie Claim for Discriminatory Termination

In this case, the parties dispute whether Dunn performed his duties satisfactorily and whether the circumstances of the termination give rise to an inference of discrimination. Defendant primarily relies on Plaintiff's history of poor performance reviews and Plaintiff's failure to adequately rebut those documents to argue that he was unqualified. Furthermore, URS notes that plaintiff has failed to produce evidence to support an inference of discrimination. Although plaintiff meets the *de minimis* burden for showing qualification, the Court agrees that the failure to demonstrate an inference of discrimination precludes the establishment of a *prima facie* claim.

In arguing that he performed his duties satisfactorily, Dunn mostly—if not solely—relies on a 2011 performance evaluation completed on January 12, 2012.[5] This is sufficient for meeting the qualification standard with the facts at hand. In evaluating whether a former employee was minimally qualified, the "inquiry should focus on the plaintiff's competence and whether he possesses the basic skills necessary for performance of the job." *Ruiz v. County of Rockland,* 609 F.3d 486, 492 (2d Cir. 2010). In cases alleging discriminatory termination, "the inference of minimal qualifications is . . . easier to draw than in a hiring or promotion cases because, by hiring the employee, the employer itself has already expressed a belief that she is minimally qualified." *Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001), *as amended* (Apr. 20, 2001); *see also Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 91 (2d Cir. 2001) (noting that the qualification is not difficult to meet when it involves the termination of a current

---

[5] Dunn was unable to produce a 2010 evaluation that he states was similarly positive.

employee with several years of experience), *as amended* (June 6, 2001). "In other words, plaintiff's burden is not to show good performance or even average performance, but merely to show he had the basic qualifications to fulfill his position." *Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561, 572 (S.D.N.Y. 2010) (citation and quotation marks omitted). In fact, it is error to find that plaintiff has failed to show a *prima facie* case based on an employer's dissatisfaction with plaintiff's performance. *See Chukwurah v. Stop & Shop Supermarket Co., LLC*, 354 F. App'x, 492, 494-495 (2d Cir. 2009). Thus, even though the significance of the 2011 evaluation is somewhat limited by other factors, it is sufficient for establishing minimal qualifications when combined with Dunn's history of employment with URS.

Regarding the fourth and final element of a prima facie claim, Dunn has failed to produce evidence supporting an inference of discrimination. "A Title VII plaintiff may establish an inference of discriminatory intent in a number of different ways depending on the specific facts of the case." *Russell v. Cnty. of Nassau*, 696 F. Supp. 2d 213, 232 (E.D.N.Y. 2010). For example, these can include: "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir.2001) (quoting *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir.1994)).

Dunn testifies that he never heard racial remarks from any URS employee during his time there. At the most, he testified that he had knowledge of a racial remark made by a URS employee to a third party. However, he was incapable of remembering the year, the department, the content of the remark, or the identities of either the speaker or the recipient. In his testimony, he contended that the basis of his discrimination allegation against Pandone was her decision to

complain about his work performance only after he inquired about a raise. Plaintiff's deposition testimony is too insufficient and conclusory for a trier of fact to conclude that URS was motivated by race.[6] See Weber v. City of New York, 973 F. Supp. 2d 227, 255 (E.D.N.Y. 2013) (collecting cases).

IV.   **Even if Dunn Had Established a Prima Facie Case, There Is No Evidence that Defendant's Legitimate Reasons for Terminating Plaintiff are Pretextual**

URS is also entitled to summary judgment on the discriminatory termination claim because there is no genuine issue of fact that it had legitimate, non-discriminatory reasons for Dunn's termination. URS reports that the termination was based on complaints from Pandone, Dunn's direct supervisor and essentially URS's client. As recounted above, Dunn's substandard performance was thoroughly documented.[7] Furthermore, URS asserts that it could not maintain any person in a position on MTA's project without MTA's approval. Thus, Dunn carries the ultimate burden of persuasion and must point to evidence sufficient to present an inference that the proffered reason is mere pretext for discriminaton. Dunn has merely provided vague testimony suggesting an animus Pandone felt toward plaintiff, but has offered no evidence that any animus was discriminatory or that racial discrimination was a substantial reason for his

---

[6] In his testimony, Dunn notes that his claims of discrimination are partially based on other disagreements between him and Pandone. Despite this testimony, Dunn has not relied on these instances in his opposition to URS's motion for summary judgment and, thus, the Court does not see any need to formally incorporate them in the present analysis. In any event, the Court has reviewed this testimony and summarily notes that these instances, at most, suggest some antagonism between Dunn and Pandone. However, this antagonism is not the sort that is typically viewed to be racially discriminatory in nature.

[7] To be clear, plaintiff's production of the 2011 evaluation cannot create an issue of material fact, as there are a number of factors undermining the significance of this evaluation for the question at hand. First, URS has contended that it terminated Dunn because Pandone, Dunn's direct supervisor, found Dunn's work to be substandard. The 2011 evaluation apparently did not reflect Pandone's opinions of Dunn's work as it was signed and seemingly completed by Vladyka. As a Program Executive overseeing URS's work on the East Side Access project, Vladyka did not have day-to-day supervision over Dunn while Dunn worked in the Force Account Materials group. Second, it remains likely that the evaluation was outdated by the time Dunn was terminated. Pandone first complained to Vladyka about Dunn's carelessness on January 20, 2012—eight days after the evaluation. Finally, reports of Dunn's carelessness also *predate* the evaluation—and thus predate Dunn's request for a raise. URS has produced evidence that, in 2009, Vladyka received complaints from MTA representatives about Dunn's performance. According to URS, these complaints led to Dunn's removal from his position as Contract Administrator and ultimate transfer to the Force Accounts Materials Group.

termination. Thus, Dunn has not made a sufficient evidentiary showing to survive summary judgment and his termination claim is dismissed with prejudice.

## V. Plaintiff Does Not Set Forth a Prima Facie Claim for Discrimination in Failure to Rehire

Defendant argues that plaintiff fails to make a *prima facie* claim due to his failure to apply for an open position while on Standby Leave and the absence of circumstances giving rise to an inference of discrimination. Plaintiff counters that he did not apply for a position because the Standby Leave policy and Tucciarone's statements gave plaintiff reasons to believe that URS would initiate the process, match plaintiff's skills to the job openings, and notify him if any there were any matches. Moreover, he contends issues of material fact exist because URS failed to contact plaintiff when two appropriate positions became available during his Standby Leave. Even if the Court assumes that plaintiff had reason to believe that it was unnecessary to apply to the position, plaintiff has failed to provide evidence of circumstances giving rise to an inference of discrimination.

Plaintiff has not provided evidence of negative treatment of African American employees, disparate application of the Standby Leave policy to African Americans, or even a different application of the Standby Leave policy to any similarly situated individual. Thus, even if the Court excuses the typical requirement that a plaintiff proves that he or she applied for the position, *see Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710 (1998), plaintiff has not met his minimal burden of supporting an inference that URS's failure to hire (or contact plaintiff) was because of plaintiff's race.[8] For these reasons, plaintiff's claim regarding the failure to rehire is also dismissed.

---

[8] In other words, even if URS's stated reason, plaintiff's failure to apply, is false, plaintiff is still required to carry his burden of persuasion on the factor of intent. As the Second Circuit noted in *Belfi v. Prendergast*, "[s]omething is

16

VI.     **Plaintiff Does Not Set Forth a Prima Facie Claim for Discriminatory Unequal Pay**

As a final matter, URS argues that Dunn is incapable of showing three of the four factors required for a prima facie case of pay discrimination. Specifically, URS argues that Dunn cannot show that he was qualified for the job in question, that he was paid less than members outside of the protected class for the same work, and that URS's failure to grant Dunn's requests for a raise occurred under circumstances that give rise to an inference of discrimination. For the purposes of deciding this motion, the Court focuses on the latter two factors.

Dunn focuses much of his argument regarding relative pay on the following two contentions: 1) that he was entitled to greater pay when Denise left the Force Account Materials group and 2) that URS discriminated against him when Vladyka submitted approval letters for twelve other employees after telling Dunn that the MTA was not approving salary increases. Both of these points ultimately miss the mark for the question at hand. First, although Dunn was not given a raise for the extra tasks he managed while his group was understaffed, he has submitted no evidence that URS increased the salaries of other employees with enlarged workloads in this time.[9] Simply put, a prima facie case for discrimination typically requires some showing of discrimination. Next, Dunn's list of twelve, non-black employees who received raises is also insufficient to meet the third factor. Dunn has failed to make any argument or provide any evidence that these employees performed under similar working conditions. Moreover, URS has established that Dunn's list is incomplete, as there were at least two African American employees who had salary increases approved by Vladyka in the same

---

still needed when the employer's reasons for its actions are shown to be pretextual, that is to say, it must also show also be shown that not only was the reason offered false, but the real reason was discrimination." 191 F.3d 129, 140 (2d Cir. 1999).

[9] In fact, URS has produced declarations from Vladyka, Malvese, and Pandone asserting that none of them received a pay increase for taking on extra responsibilities in this interim period and that neither Vladyka nor Malvese knows of anyone who received a pay increase due to an increased workload in this period.

17

period as the twelve non-black employees. Accordingly, Dunn cannot show that he was paid less than other employees of his class for work requiring substantially the same responsibility.

On the final factor, Dunn has also failed to provide evidence that the circumstances surrounding his failure to receive a raise give rise to an inference of discrimination. In this claim, Dunn's accusations of discriminatory action are essentially focused on Vladyka. However, Vladyka seems to have been largely responsible for Dunn keeping his job after the MTA's complaints in 2009. He was the one who asked the MTA to approve a raise for Dunn and was denied because of the MTA's evaluation of Dunn's performance. Vladyka also wrote letters to the MTA requesting promotions or raises for numerous other African American employees over time, including two in the period selected by plaintiff. Moreover, Dunn has testified that he has never heard Vladkya make any racial remarks. The parties' disagreement about why Vladyka notified Dunn that MTA was not approving raises does not raise a genuine dispute of material fact to establish a prima facie claim. Dunn's list of non-black employees who received a raise is similarly insufficient for raising an inference of discriminatory intent. Accordingly, plaintiff's claim for unequal pay is dismissed with prejudice.

## CONCLUSION

Dunn fails to state a prima facie claim for discrimination under Title VII. URS's motion for summary judgment (ECF No. 53) is GRANTED.

The Clerk of Court is respectfully directed to close this case and to enter judgment in accordance with this Order.

**SO ORDERED.**

**Dated:**     **New York, New York**
              **September 30, 2016**

                                          **ANDREW L. CARTER, JR.**
                                          **United States District Judge**